IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY DONNELL THOMAS,<br><br>              Plaintiff,<br><br>      vs.<br><br>J. CELAYA, et al.,<br><br>              Defendants.<br>_____ | No. C 06-00489 JF (PR)<br><br>ORDER GRANTING MOTION TO<br>DISMISS; GRANTING MOTION FOR<br>SUMMARY JUDGMENT<br><br><br><br>(Docket No. 87) |

Plaintiff, a state prisoner proceeding pro se, brought the instant civil rights action

pursuant to 42 U.S.C. § 1983.  The Court found that Plaintiff's second amended

complaint ("SAC"), (Docket No. 67), when liberally construed, stated cognizable claims,

and ordered service on Defendants Lieutenant J. Celaya, Lieutenant Ross, Correctional

Officer Kowalski, Correctional Officer J. Lopez, Sergeant J. Newton, Sergeant Locke,

and Sergeant J. Stevenson at Salinas Valley State Prison ("SVSP").[1]  To date, Officer

Lopez has not yet been properly served.  All other Defendants move to dismiss the claims

---

[1] The Court dismissed all claims against Defendant Captain A. Hedgpeth for failure to
state a claim.  (See Docket No. 71.)

against Celaya for failure to exhaust administrative remedies, and for summary judgment with respect to the remaining claims. (Docket No. 87.) Plaintiff has filed opposition,[2] and Defendants have filed a reply.

## DISCUSSION

### I.    Statement of Facts

The following facts are undisputed unless otherwise indicated. Plaintiff's allegations against the moving Defendants involve events that occurred at SVSP between November 4 and November 7, 2002. On November 4, 2002, Plaintiff was housed in Facility C at SVSP and was cleared to double cell. (SAC at 6.) Because Plaintiff was beginning to experience "incompatibility issues" with his cellmate, it became necessary to alter his housing arrangements. (Id.) Plaintiff himself made a request for a convenience cell move, *i.e.*, specifically to swap places with an inmate who was housed in a cell by himself. (Id.) For unspecified reasons, Plaintiff's desired move did not occur. (Id.)

According to the declarations submitted in support of Defendants' motion, cell moves can be a difficult process depending on the amount of space available and the particular inmate involved. (J. Stevenson Decl. at 2, Docket No. 94.) At that time, SVSP was experiencing acute population pressures because of a heavy intake of inmates. (Id.; J. Celaya Decl. at 2, Docket No. 88.) In particular during the week of November 4, 2002, SVSP was scheduled to receive forty-nine additional inmates on seven buses, and six of these buses were scheduled to arrive at SVSP on November 6, 2002. (T. Frye Decl. at 2. Docket No. 89.) Double-celling was necessary to free-up bed space. (Celaya Decl. at 2.)

Placing Plaintiff with a new cellmate presented various challenges, especially as his placement ranked as an eight on a scale of one to ten, with ten being the most difficult. (Stevenson Decl. at 2.) Factors that complicated Plaintiff's placement included his

---

[2] The Court notes that Plaintiff filed additional copies of his opposition and exhibits thereto on August 12, 2010, (Docket Nos. 115-17), which are in essence the same as the papers filed on July 16, 2010, (Docket Nos. 110-11).

security level, gang affiliation, ethnicity, and willingness to have a cellmate. (Id.) At the time, it was customary for African-American inmates, such as Plaintiff, to be housed with other African-American inmates. Moreover, Plaintiff himself admitted that although he was unaffiliated with a prison gang, the fact that he has been housed with Crip gang members precluded him from being housed with active members of other prison gangs. (SAC at 6.) Additionally, the acute population pressures at SVSP further complicated housing assignments because there were fewer inmates at the prison who were approved to double cell and did not already have a cellmate. (Stevenson Decl. at 2.)

In an effort to find Plaintiff a compatible cellmate, prison officials brought Plaintiff and four other inmates into the hobby shop of Facility C. (Id.) These individuals were selected specifically because they were African-American and were unaffiliated with a prison gang. (Id.) Stevenson informed the inmates that they needed to talk with each other to determine whether they would be compatible cellmates. While two of the inmates immediately agreed to be cellmates, Plaintiff and the remaining two inmates did not agree to be cellmates with each other. (Id.) They were sent to SVSP's Receiving and Release ("R&R") facility, as there were no available cells at Facility C. (Id.)

Plaintiff arrived at the R&R on the evening of November 4, 2002, and he remained there for two nights until November 6, 2002, when the six buses of inmates arrived at SVSP, which required that all R&R cells be made available. (Frye Decl. at 2.) A copy of the R&R log book confirms the dates of Plaintiff's time in the R&R, and that several transports arrived at the prison on November 6, 2002. (Celaya Decl., Ex. B.) Plaintiff was assigned back to a cell in Facility C. (SAC at 9.)

Plaintiff arrived back in Facility C at around 8:00 p.m. on November 6, 2002. (Id.) He was assigned to a cell with another inmate who appeared to be compatible with him, but for unknown reasons the arrangement did not work out. (Celaya Decl. at 3.) According to Plaintiff, the inmate refused to be housed with him because Plaintiff was not a "Bay Area Cat[]." (SAC at 9.) There being no other cells available, Plaintiff was temporarily placed in Facility C's sallyport, a vestibule that connects the housing portion

of Facility C to its recreation yard. (Celaya Decl. at 3.) According to Plaintiff, Locke placed him in the sallyport and left him there overnight. (SAC at 9-10.) The sallyport typically serves as a temporary storage or inmate holding area, but occasionally it is used as a temporary housing area. (Celaya Decl. at 3.) According to Defendants, the sallyport is appropriate for temporarily housing an inmate because it is completely enclosed, is slightly smaller in size to a cell, and has access to the recreation yard's restroom. (Id.)

When he was placed in the sallyport, Plaintiff was provided with a mattress and blanket. (SAC at 10.) Plaintiff alleges that he should have been provided with a second blanket and that he got "drenched" by a rain storm and had to endure cold weather conditions when he had to use the recreation yard restroom. (Id.) Defendants ask that the Court take judicial notice of the official climatological data showing that no precipitation was recorded in the area surrounding SVSP on November 6, 2002. (Req. for Jud. Not., Docket No. 96.) Defendants assert that Plaintiff made no complaints about the conditions until the following morning, on November 7, 2002. (Mot. at 5; SAC at 10.)

On the morning of November 7, 2002, Plaintiff reported to the Facility C's program office. (SAC at 10.) The program office is divided into offices for various prison personnel with a portion serving as a workspace for inmate clerks. (J. Hughes Decl. at 2, Docket No. 90.) On this particular morning, there were approximately four to six inmates working as clerks in the program office. (Id.) Plaintiff approached Sergeant Hughes and "verbally described the entire saga of events that had transpired" over the last few days. (SAC at 10.) According to Hughes, Plaintiff was "increasingly aggressive and agitated." (Hughes Decl. at 2.) Plaintiff alleges that while he was speaking with a prison official, Celaya came and "intervened"in the conversation. (SAC at 11.) Celaya states the he was concerned that Plaintiff, who appeared to be extremely agitated, might assault him or the other staff members within the immediate vicinity. (Celaya Decl. at 3.) Celaya instructed Plaintiff to return to the sallyport, but Plaintiff refused. (Id.; SAC at 11.) Meanwhile, Hughes went to secure the location where the inmate clerks were working to prevent them from being involved in the event an altercation arose. (Hughes

Decl. at 2.) Hughes was still able to hear and observe Plaintiff's interaction with Celaya. (Id.) According to both Celaya and Hughes, Celaya instructed Plaintiff that he needed to "cuff up" immediately. (Id.; Celaya Decl. at 2.) Plaintiff complied only after he was warned that Celaya would have no choice but to use force to obtain his compliance. (Id.) According to Celaya and Hughes, Plaintiff thereafter was escorted out of the program office without incident. (Id.)

Plaintiff admits that he initially refused Celaya's order to return to the sallyport. (SAC at 11.) However, Plaintiff alleges that he had "five cannisters [sic] of pepperspray [sic] aimed mennacingly [sic] at [his] face" in response to his refusal by correctional staff members. (Id.) Plaintiff also claims that he was cuffed without any warning. (Id.) Plaintiff alleges that after he complied with Celaya's order, one of the correctional staff members began to remove Plaintiff's right shoe, which caused him to cringe his right leg upwards. (Id.) Plaintiff alleges that Celaya then put his knee on Plaintiff's face and applied his entire body weight, smashing Plaintiff's face into the floor. (Id.) Plaintiff alleges that the excessive force by Celaya left a large knot and a bruise on his face. (Id.) Plaintiff also claims that during the incident pepper spray actually was released and contaminated him. (Id. at 12.) Plaintiff alleges that when escorting staff members were about to take him to the medical clinic, Celaya intervened and directed them to take Plaintiff back to the sallyport. (Id.)

Plaintiff states that shortly after he was returned to the sallyport, he asked Kowalski for some toilet paper and to be allowed to use the recreation yard restroom. (SAC at 12.) Plaintiff claims that he also requested that a nurse be contacted to provide care for the alleged injury to his face and pain, among other medical needs. (Id.) Plaintiff alleges that Kowalski denied all of his requests, violating his rights under the Eighth Amendment. In response to these allegations, Kowalski has submitted a declaration stating that he did not work at SVSP's Facility C during November 2002. (M. Kowalski Decl. at 1-2, Docket No. 91.) Defendants also have submitted the declaration of a non-party, Medical Technical Assistant ("MTA") G. Lauber, who states that she examined

Plaintiff at 9:15 a.m. on November 7, 2002, in the Facility C sallyport. (G. Lauber Decl. at 2, Docket No. 92.) MTA Lauber recalls that she conducted an unclothed body assessment of Plaintiff, during which she did not detect any injury or trauma. (Id.) MTA Lauber also does not recall Plaintiff complaining of being exposed to OC pepper spray, a complaint that she would have documented on the medical report. (Id., Ex A.) According to the medical report, Plaintiff refused to have his blood pressure and other vital signs taken. (Id.)

Plaintiff was transferred to Facility B to double cell with another inmate during the evening of November 7, 2002. (SAC at 13, 16.) Defendants state that in sum, Plaintiff spent less than twenty-four hours in Facility C's sallyport. Defendants contend that the remaining allegations in the SAC are irrelevant to them or the claims at issue.

Plaintiff alleges the following claims as grounds for relief: 1) all Defendants retaliated against him for exercising his First Amendment rights, (SAC at 20); 2) Celaya violated his First Amendment right of access to courts, (id. at 21, 22); 3) Celaya used excessive force against him in violation of the Eighth Amendment prohibition against cruel and unusual punishment, (id. at 22); 4) Plaintiff suffered inhumane conditions in violation of the Eighth Amendment while he was housed in the Facility C sallyport, (id. at 23-24); and 5) Celaya and Kowalski failed to provide adequate care for his serious medical needs, (id. at 25). (Mot. at 2-3.)

## II.    Exhaustion

Defendants move to dismiss Plaintiff's second and fifth claims against Defendant Celaya on the grounds that Plaintiff failed to exhaust his administrative remedies with respect to these claims. (Mot. at 7.) The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and no longer left to the discretion of the district court. Woodford v. Ngo,

548 U.S. 81, 84 (2006) (citing <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001)).  "Prisoners

must now exhaust all 'available' remedies, not just those that meet federal standards." <u>Id.</u>

Even when the relief sought cannot be granted by the administrative process, i.e.,

monetary damages, a prisoner must still exhaust administrative remedies.  <u>Id.</u> at 85-86

(citing <u>Booth</u>, 532 U.S. at 734).

     The PLRA  requires "proper exhaustion" of available administrative remedies.  <u>Id.</u>

at 93.  This requirement cannot be satisfied "by filing an untimely or otherwise

procedurally defective administrative grievance or appeal." <u>Id.</u> at 84.  "The text of 42

U.S.C. § 1997e(a) strongly suggests that the PLRA uses the term 'exhausted' to mean

what the term means in administrative law, where exhaustion means proper exhaustion."

<u>Id.</u> at 92.  "Proper exhaustion demands compliance with an agency's deadlines and other

critical procedural rules because no adjudicative system can function effectively without

imposing some orderly structure on the course of its proceedings." <u>Id.</u> at 90-91 (footnote

omitted).  A prisoner must complete the administrative review process in accordance with

the applicable procedural rules, including deadlines, as a precondition to bringing suit in

federal court.  <u>See id.</u> at 87; <u>see also</u> <u>Johnson v. Meadows</u>, 418 F.3d 1152, 1159 (11th Cir.

2005) (holding that, to exhaust remedies, a prisoner must file appeals in the place, and at

the time, the prison's administrative rules require); <u>Ross v. County of Bernalillo</u>, 365 F.3d

1181, 1185-86 (10th Cir. 2005) (same).

     The State of California provides its inmates and parolees the right to appeal

administratively "any departmental decision, action, condition, or policy which they can

demonstrate as having an adverse effect upon their welfare."  Cal. Code Regs. tit. 15,

§ 3084.1(a).  It also provides its inmates the right to file administrative appeals alleging

misconduct by correctional officers.  <u>See id.</u> § 3084.1(e).  In order to exhaust available

administrative remedies within this system, a prisoner must proceed through several

levels of appeal: (1) informal resolution, (2) formal written appeal on a CDC 602 inmate

appeal form, (3) second level appeal to the institution head or designee, and (4) third level

appeal to the Director of the California Department of Corrections and Rehabilitation.  <u>Id.</u>

§ 3084.5; <u>Barry v. Ratelle</u>, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997). This satisfies the administrative remedies exhaustion requirement under § 1997e(a). <u>Id.</u> at 1237-38.

Nonexhaustion under § 1997e(a) is an affirmative defense. <u>Jones v. Bock,</u> 127 S. Ct. 910, 922-23 (2007); <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003). Defendants have the burden of raising and proving the absence of exhaustion, and inmates are not required to specifically plead or demonstrate exhaustion in their complaints. <u>Jones</u>, 127 S. Ct. at 921-22. As there can be no absence of exhaustion unless some relief remains available, a movant claiming lack of exhaustion must demonstrate that pertinent relief remained available, whether at unexhausted levels or through awaiting the results of the relief already granted as a result of that process. <u>Brown v. Valoff</u>, 422 F.3d 926, 936-37 (9th Cir. 2005).

A nonexhaustion claim should be raised in an unenumerated Rule 12(b) motion rather than in a motion for summary judgment. <u>Wyatt</u>, 315 F.3d at 1119. In deciding such a Rule 12(b) motion, the court may look beyond the pleadings and decide disputed issues of fact. <u>Id.</u> at 1119-20. If the court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal without prejudice. <u>Id.</u> at 1120.

Defendants argue that while Plaintiff exhausted the majority of the claims contained in the SAC, he failed to exhaust his claims that Celaya interfered with his access to the courts and was deliberately indifferent to his medical needs. Defendants identify inmate appeal no. SVSP D-03-01410 as the relevant appeal to the SAC. According to the declaration of E. Medina, the Appeals Coordinator at SVSP, this appeal was received on April 15, 2003. (E. Medina Decl. at 2.) The appeal appears to relate to the "group employee misconduct complaint" that Plaintiff alleges he filed on April 15, 2003, claiming violations of his constitutional rights by Celaya, Ross, Newton, Stevenson, Locke and Kolwoski. (SAC at 15.) According to Medina's declaration and the documents in support thereof, the appeal was partially granted at the second level of review and denied at the third level of review. (Medina Decl. at 2, Ex. A at 5.) Medina states and would testify if called to do so, that Plaintiff did not submit an inmate appeal

concerning his allegations that Celaya interfered with his access to the courts and was deliberately indifferent to his medical needs during November 2002.  (Id. at 3.)

In his opposition paper, Plaintiff admits that appeal no. SVSP D-03-01410 is the appropriate and only relevant appeal with respect to the SAC, but he contends that the appeal is sufficient to exhaust his claims against Celaya.  (Oppo. at 5.)  Plaintiff claims that he clearly stated in the appeal that "[a]s a result I didn't get my medication for four days; I couldn't address my legal issues; and the majority of my property was lost."  (Id.; Ex. B.)  Plaintiff argues that these allegations were specific enough to give Defendant Celaya "fair notice" of the claims against him and thereby sufficient for exhaustion. (Oppo. at 5.)

The Court has examined the inmate appeal at issue, and finds that the allegations therein were not sufficient to give fair notice to Celaya of Plaintiff's claims of interference of access to courts or deliberate indifference to serious medical needs.  The allegations are similar to those asserted in the SAC with respect to Plaintiff's claims of retaliation, excessive force and inhumane conditions.  However, nowhere in the appeal does Plaintiff mention access to the courts or make any allegation that Celaya wrongfully interfered with Plaintiff's ability to obtain medical attention.  Accordingly, the Court finds that Plaintiff has failed to administratively exhaust his claims of right of access to the courts and deliberate indifference to serious medical needs against Celaya. Defendants' motion to dismiss these two claims against Celaya on this basis is GRANTED.

**III.   Summary Judgment**

Defendants move for summary judgment with respect to the remaining claims against them.  (Mot. at 9.)

Summary judgment is proper where the pleadings, discovery and affidavits show that there is 'no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Id. at 323.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. Keenan v. Allan, 91 F.3d 1275, 1279

(9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Id. If the nonmoving party fails to do so, the district court may grant summary judgment in favor of the moving party. See id.; see, e.g., Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028-29 (9th Cir. 2001).

## A.    Claims against Kowalski

Plaintiff's claims against Kowalski are for deliberate indifference to his physical well-being and serious medical needs based on Kowalski's alleged actions on November 7, 2002. See supra at 5. Kowalski asserts that Plaintiff's claims against him fail as a matter of law because he was not working in Facility C of SVSP at the time. (Kowalski Decl. at 1.)

According to his payroll records and recollection, Kowalski was the third watch yard officer for Facility E at SVSP from April 29, 2002 to December 2, 2002. (Id.) Kowalski's "employee attendance record" also indicates that he was nowhere near Facility C on November 7, 2002. (Id., Ex. A.) In opposition, Plaintiff insists that he has the proper defendant with a "a confusing name." (Oppo. at 7.) Plaintiff also indicates that the intended defendant may have another name, i.e., "Sztukowski" or"Ski." (Oppo. at 7.) However, these allegations are insufficient to raise a genuine issue of fact as to whether Kowalski was in the vicinity of Facility C on November 7, 2002. At most, Plaintiff's opposition only tends to show that Plaintiff may have sued the wrong defendant.

## B.    Retaliation

Plaintiff claims that all Defendants retaliated against him for exercising his First Amendment rights. (SAC at 20.) Defendants contend that Plaintiff fails to satisfy the necessary elements of a retaliation claim. (Mot. at 10.) "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Accord Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under § 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline); Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994) (per curiam) (same); Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985) (contention that actions "arbitrary and capricious" sufficient to allege retaliation).

Defendants assert that the SAC only contains conclusory and speculative allegations about their conduct, particularly with respect to Plaintiff's allegations that they acted adversely to his seeking single cell status. (Mot. at 10-11.) Defendants argue that Plaintiff's seeking single cell status and repeated refusals of a cellmate do not constitute constitutionally protected conduct. Defendants also contend that Plaintiff has failed to show that their actions did not reasonably advance a legitimate correctional goal. Defendants have submitted undisputed evidence showing that SVSP was experiencing acute population pressures during November 2002 that required all appropriate inmates to be double-celled. (Celaya Decl.; Stevenson Decl.; Frye Decl.) It also is undisputed that Plaintiff was one of those inmates who was cleared to double cell. (SAC at 6.) Defendants contend that in light of the lack of space and Plaintiff's own refusal of a compatible cellmate, they acted appropriately in placing Plaintiff temporarily in the R&R and the Facility C sallyport.

In his opposition brief, Plaintiff asserts that Defendants were aware that he desired single cell status, and that there was an "absence of a legitimate penological interest for the Defendants repeated reference to Operation Procedure #36." (Oppo. at 8.) In support, Plaintiff submits a letter from the Office of the Inspector General, addressing his complaint about his housing status at SVSP. (Oppo., Ex. F.) However, contrary to Plaintiff's assertion, this letter provides no factual evidence with respect to the absence of

legitimate penological interest.  In fact, the letter states that after reviewing the matter, the Inspector General found that SVSP staff acted in compliance with the prison's procedures applicable to Plaintiff's temporary housing placement and that the related disciplinary action against Plaintiff was justified.  (Id.)

The Court concludes that Plaintiff has failed to show that Defendants' actions with respect to his housing situation were retaliatory or violated his constitutional rights. Plaintiff fails to show that Defendants took adverse action against him that prevented him from obtaining the cell switch he sought.  It is undisputed that in fact Defendants attempted to allow Plaintiff to choose a preferred cellmate among a pool of suitable inmates, but that Plaintiff did not agree to any of them.  Plaintiff also fails to show that single cell status is a constitutionally protected right.  Finally, there is no evidence that Defendants' actions in placing Plaintiff in temporary housing in the R&R for two days and then in the Facility C sallyport for one evening did not reasonably advance a legitimate penological goal, i.e., preserving institutional order and discipline.  Barnett, 31 F.3d at 816.  It is true that Plaintiff's desired cell switch did not occur, but Plaintiff cannot show that the failed switch was due to any unconstitutional action by Defendants. Because  Plaintiff has failed to meet his burden of designating "'specific facts showing that there is a genuine issue for trial,'" Defendants are entitled to judgment as a matter of law on Plaintiff's retaliation claim.  Celotex Corp., 477 U.S. at 323-24 (citations omitted).

**C.    Excessive Force**

Plaintiff next claims that Celaya used excessive force on the morning of November 7, 2002, when he was directing Plaintiff to leave the Facility C program office and return to the sallyport.  See supra at 4-5.  When prison officials stand accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  In making this assessment, a court may evaluate the need for application of force, the relationship between that need and the amount of

force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7; LeMaire v. Maass, 12 F.3d 1444, 1454 (9th Cir. 1993); see also Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation); see, e.g., Watts v. McKinney, 394 F.3d 710, 712-13 (9th Cir. 2005) (finding that kicking the genitals of a prisoner who was on the ground and in handcuffs during an interrogation was "near the top of the list" of acts taken with cruel and sadistic purpose to harm another); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) (pepper-spraying fighting inmates a second time after hearing coughing and gagging from prior spray was not malicious and sadistic for purpose of causing harm, where initial shot of spray had been blocked by inmates' bodies).

There is a factual dispute in the record with respect to whether Celaya actually used the force alleged by Plaintiff – that Celaya put his knee on Plaintiff's face and applied his entire body weight, smashing Plaintiff's face into the floor. (SAC at 11.) Plaintiff alleges that Celay's actions left a large knot and a bruise on his face. (Id.) However, both Celaya and Hughes state that Plaintiff was escorted from the program office without incident. (Celaya Decl. at 2; Hughes Decl. at 2.)

Defendants argue that this factual dispute is immaterial because even under Plaintiff's version of the facts, Celaya would have been authorized to use force. Plaintiff alleges in the SAC that he was eager to describe the "entire saga of events that had transpired... over the past few days" to someone at the program office. (SAC at 10-11.) Defendants describe Plaintiff as a large inmate known for having a temper. (Celaya Decl. at 2; Hughes Decl. at 2; Stevenson Decl. at 2.) Plaintiff does not dispute that he initially refused Celaya's order to return to the sallyport. (SAC at 11.) It is undisputed that there were several bystanders, including inmates and correctional officers. Defendants were concerned that if the situation between Celaya and Plaintiff continued to escalate, these bystander inmates would become involved and cause a breach in security at the prison with serious injuries to officials and inmates. (Celaya Decl. at 2; Hughes Decl. at 2.)

Defendants contend that by his own admissions, Plaintiff "began acting erratically by diving to the floor, covering his face with his hands, and kicking his right leg upward." (Mot. at 12-13, citing SAC 11.) Plaintiff claims that he did so because an unidentified officer began to take off Plaintiff's right shoe. (SAC at 11.) Defendants assert that under these circumstances, it was necessary to subdue Plaintiff quickly and escort him away from the program office. (Mot. at 13.) With respect to his injuries, Plaintiff makes no effort to refute MTA Lauber's report other than to state condemningly that the report is "completely bogus." (Opp. at 10.)

Based on the entire record, the Court concludes that there is no genuine issue as to any material fact and that Defendants are entitled to judgment as a matter of law on Plaintiff's excessive force claim. Fed. R. Civ. P. 56(c). Notwithstanding the dispute over the extent of Celaya's use of force, Defendants have shown that the dispute is immaterial, because even under Plaintiff's version of the facts, the force used would have been appropriate. Hudson, 503 U.S. at 7. By his own admission, Plaintiff initially resisted Celaya's orders to leave the program office. Defendants had a legitimate concern about maintaining discipline as well as the safety and security of the program office where both correctional officers and inmates were present. If Plaintiff was behaving erratically, even if an unidentified officer was attempting to remove his shoe, it does not appear that Celaya responded unreasonably to subdue Plaintiff quickly and avoid further physical altercation. The amount of force used was no more than was necessary to stop Plaintiff's erratic flailing; Celaya forced Plaintiff to the floor and did nothing further.

Plaintiff claims that he suffered a large knot and bruise on his face. The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could possibly have been thought necessary in a particular situation. Hudson, 503 U.S. at 7. The extent of injury also may provide some indication of the amount of force applied. Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010). However, not every malevolent touch by a prison guard gives rise to a federal claim for relief. Hudson, 503 U.S. at 9. The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes

from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. Id. An inmate who complains of a push or shove that causes no discernable injury almost certainly fails to state a valid excessive force claim. Id. Here, MTA Lauber examined Plaintiff approximately one hour after the incident and found no discernable physical injury or trauma. See supra at 6. Even if Plaintiff suffered the alleged injuries to his face, they were not the result of such an amount of force to indicate an intent maliciously and sadistically to cause harm. Hudson, 503 U.S. at 9.

### D. Inhumane Conditions

Plaintiff claims that Defendants acted with deliberate indifference to his physical needs during the course of his temporary housing in the R&R and then in the Facility C sallyport. The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. See Helling v. McKinney, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes duties on prison officials, who must provide all inmates with the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety. See Farmer, 511 U.S. at 832; DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 199-200 (1989); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).

A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, id. (citing Wilson, 501 U.S. at 297).

### 1. Objective Prong

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the

circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it can be withheld. See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000). Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim. See id. at 732-733; see, e.g., Hearns v. Terhune, 413 F.3d 1036, 1041-42 (9th Cir. 2005) (allegations of serious health hazards in disciplinary segregation yard for a period of nine months, including toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects, and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees, enough to state a claim of unconstitutional prison conditions); Anderson v. County of Kern, 45 F.3d 1310, 1314 (9th Cir.) ("[A] lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment."), amended, 75 F.3d 448 (9th Cir.), cert. denied, 516 U.S. 916 (1995).

Plaintiff claims that Newton, Ross and Stevenson were deliberately indifferent to his physical needs by placing him in the R&R, where he was subjected to inhumane conditions. (SAC at 23.) Defendants argue that the SAC does not contain any factual allegations regarding the allegedly inhumane conditions in the R&R. Defendants also argue that there is no evidence that Locke acted with deliberate indifference to Plaintiff's physical needs by placing him in the Facility C sallyport overnight; Plaintiff admits that he received a mattress and blanket for the night. (SAC at 10.) Defendants contend that Plaintiff's allegations that he was subjected to damp conditions are "farfetched" because the sallyport is a completely enclosed room and it did not rain on November 6, 2002. (Req. for Jud. Not., Ex. A; Celaya Decl. at 2.)

Plaintiff claims that being forced to sleep on the floor in the R&R and being left in the sallyport overnight where he was subjected to "extreme cold weather and rain" without appropriate clothing and bedding "evinces the deprivation of a basic human need." (Oppo. at 11-12.) Plaintiff insists that the Defendants' claim that it did not rain on the night of November 6, 2002, is false. (Oppo. at 12.) Plaintiff submits the declaration

of a fellow inmate who states that on the evening of November 6, 2002, Plaintiff was "exposed to the cold wind by way of space under the doors, and it was very damp due to rainy conditions." (Oppo., Ex. C. at 3.) In addition to pointing out the lack of factual support for Plaintiff's claims, Defendants also point out that Plaintiff did not complain about these allegedly inhumane conditions until November 7, 2002, at which time he was transferred to a suitable double-cell in Facility B. (Id.)

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not raised a genuine issue of fact as to whether he was subjected to inhumane conditions that were either substantial or severe as alleged in the SAC. At worst Plaintiff was subjected to two nights of sleeping on the floor. There is no legal authority holding that being forced to sleep on the floor in an otherwise safe and secure area, with adequate shelter, food, drinking water and sanitation, constitutes a substantial deprivation of Eighth Amendment protections. See Johnson, 217 F.3d at 732-733. Plaintiff does not allege that he was subjected to serious health hazards during the two days he was at R&R. See Hearns, 413 F.3d at 1041-42. The same is true with respect to the single night Plaintiff spent in the sallyport, even assuming the presence of cold and damp conditions, where Plaintiff otherwise was provided with shelter, food, water and access to a restroom.

## 2. Subjective Prong

The requisite state of mind to establish an Eighth Amendment violation depends on the nature of the claim. In prison-conditions cases, the necessary state of mind is one of "deliberate indifference." See, e.g., Farmer, 511 U.S. at 834 (inmate safety); Helling, 509 U.S. at 32-33 (inmate health); Wilson, 501 U.S. at 302-03 (general conditions of confinement); Estelle v. Gamble, 429 U.S. 97, 104 (1976) (inmate health).

Neither negligence nor gross negligence will constitute deliberate indifference. See Farmer, 511 U.S. at 835-36 & n.4; see also Estelle, 429 U.S. at 106 (establishing that deliberate indifference requires more than negligence). A prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of

confinement unless the standard for criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate health or safety. See Farmer, 511 U.S. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. See id. An Eighth Amendment claimant need not show, however, that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. See id. at 842; see also Robins v. Meecham, 60 F.3d 1436, 1439-40 (9th Cir. 1995) (bystander-inmate injured when guards allegedly used excessive force on another inmate need not show that guards intended to harm bystander-inmate). This is a question of fact. See Farmer, 511 U.S. at 842. A trier of fact may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious; a plaintiff therefore may meet his burden of showing awareness of a risk by presenting evidence of very obvious and blatant circumstances indicating that the prison official knew the risk existed. Foster v. Runnels, 554 F.3d 807, 814 (9th Cir. 2009) ("risk that an inmate might suffer harm as a result of the repeated denial of meals is obvious").

As discussed above, the Court has determined that the conditions Plaintiff allegedly faced in the R&R and the sallyport were neither substantial nor severe enough to rise to the level of an Eighth Amendment violation. Accordingly, it cannot be said that Defendants' acted with deliberate indifference to his Plaintiff's physical needs in placing him there. Nevertheless, even assuming that Plaintiff did experience inhumane conditions, there is no evidence that Defendants acted with deliberate indifference to Plaintiff's basic needs.

There is no evidence in the record that Defendants knew of and disregarded an excessive risk to Plaintiff's health or safety by forcing Plaintiff to sleep on the ground for two nights, particularly given Plaintiff's admission that he was provided with a mattress and a pillow. See Farmer, 511 U.S. at 837. There is no evidence that Defendants were aware of facts permitting an inference that a substantial risk of serious harm existed, or

that Defendants in fact drew the inference, or that they nevertheless failed to act.  See id.

As to the night Plaintiff spent in the sallyport, there is no evidence that Locke, or any other Defendant, acted with deliberate indifference to Plaintiff's needs.  Plaintiff alleges that Defendants "neglected to give Plaintiff a second blanket and/or appropriate clothing [and] bedding for the extreme cold." (SAC at 10.)  However, neither negligence nor gross negligence will constitute deliberate indifference.  See Farmer, 511 U.S. at 835-36 & n.4.  Defendants have introduced climatological data showing that there was no rain on November 6, 2002, and in any event, the sallyport is a completely enclosed room that is not exposed to outdoor conditions.  Moreover, there is no evidence that Defendants knew that Plaintiff actually was experiencing cold and damp conditions at the time, as he did not voice his complaints until the following morning.

## IV.    Unserved Defendant J. Lopez

The Court ordered service of the SAC upon Defendant J. Lopez, along with other Defendants, on April 21, 2010.  (See Docket No. 71.)  The Attorney General's office filed a notice of errata and request for correction regarding service of the SAC on Defendant J. Lopez on June 4, 2010, (Docket No. 86), contesting the execution of the summons on this defendant, (Docket No. 80).  According to the letter submitted in support of this notice, SVSP notified the U.S. Marshal's Service on May 5, 2010, that it would not accept service of the SAC on Lopez because there are five correctional officers with the same first initial and last names.  (Docket No. 86 at 1.)  To complete service, SVSP requested that additional information be provided, such as a complete first name.  (Id.)

On June 15, 2010, the clerk of the Court notified Plaintiff that he would need to provide Lopez's name to insure service.  (Docket No. 99.)  Plaintiff filed a response stating that he had no further information to provide.  (Docket No. 104.)  Accordingly, Defendant J. Lopez has not yet been served.  Although a plaintiff who is incarcerated and proceeding in forma pauperis may rely on service by the Marshal, such plaintiff "may not remain silent and do nothing to effectuate such service"; rather, "[a]t a minimum, a plaintiff should request service upon the appropriate defendant and attempt to remedy any

apparent defects of which [he] has knowledge." <u>Rochon v. Dawson</u>, 828 F.2d 1107, 1110 (5th Cir. 1987). Here, Plaintiff's complaint has been pending for more than 120 days, and thus, absent a showing of "good cause," is subject to dismissal without prejudice. <u>See</u> Fed. R. Civ. P. 4(m). Because Plaintiff has been unable to provide sufficient information to allow the Marshal to locate and serve Lopez, the Court has no choice but to dismiss the claims against Lopez without prejudice under Rule 4(m). <u>See</u> <u>Walker v. Sumner</u>, 14 F.3d at 1421-22 (holding prisoner failed to show cause why prison official should not be dismissed under Rule 4(m) where prisoner failed to show he had provided Marshal with sufficient information to effectuate service).

**CONCLUSION**

For the foregoing reasons,

Celaya's motion to dismiss is GRANTED. Plaintiff's claims against Celaya with respect to access to the courts and deliberate indifference to serious medical needs are DISMISSED without prejudice to refiling after all available administrative remedies have been properly exhausted. <u>Wyatt</u>, 315 F.3d at 1120.

Defendants' motion for summary judgment otherwise is GRANTED. All claims against Ross, Kowalski, Newton, Locke, and Stevenson are DISMISSED with prejudice.

All claims against Lopez are DISMISSED without prejudice under Federal Rule of Civil Procedure Rule 4(m).

Defendants B. Rankin, D. Mantel, Martinez, Van Huss, Navarro, T. M. Selby, B. Jiminez, Chavez, E. Perez, and Espinoza also are DISMISSED from this action, as Plaintiff made no claims against them in his Second Amended Complaint.

This order terminates Docket No. 87.

IT IS SO ORDERED.

DATED: _3/29/11_____

_____
JEREMY FOGEL
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


LARRY D. THOMAS,

              Plaintiff,

  v.

J. CELAYA, et al.,

              Defendants.

_____/

Case Number: CV06-00489 JF

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on ___3/29/11_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Larry Donnell Thomas H-79847
California State Prison - Corcoran
PO Box 3476
4A 3D 10
Corcoran, CA 93212


Dated: ___3/29/11_____

                          Richard W. Wieking, Clerk